UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

|  |  |  |
|---|---|---|
| TELEMATICA LEFIC, S.A. DE C.V., a Mexican Corporate Entity, DYNTRA, S.A. DE C.V., a Mexican Corporate Entity, ROSA MARIA ROMERO VARGAS, and ERNESTO ZAVALA,<br><br>Plaintiffs,<br><br>v.<br><br>ANTONIO J. SOCORRO MARIN, and IQUANTICS CORP., a Florida corporation,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION<br>NO. 3:24-00290-WGY-SJH |

YOUNG, D.J.[1]                                        June 29, 2026

**MEMORANDUM & ORDER**

## I.    INTRODUCTION AND PROCEDURAL HISTORY

For the reasons stated below, the motion for summary judgment, ECF No. 119, is ALLOWED only as to counts I, V, XII, XX and XXVI, and otherwise DENIED.

Telemática Lefic, S.A. De C.V. ("Lefic"), Dyntra, S.A. De C.V. ("Dyntra"), Rosa María Romero Vargas ("Romero"), and Ernesto Zavala ("Zavala") (collectively, "the Plaintiffs") filed suit against Antonio J. Socorro Marin ("Socorro") and Iquantics Corp. ("Iquantics") (collectively, "the Defendants") on March 21, 2024, Compl., ECF No. 1, then filed the operative Amended

---

[1] Of the District of Massachusetts, sitting by designation.

Complaint on August 7, 2024, Am. Compl., ECF No. 61.  The Plaintiffs bring twenty-eight counts including a civil Racketeer Influenced and Corrupt Organizations Act ("RICO") violation, 18 U.S.C. § 1961 et seq., fraud, conversion, breach of contract and related claims. Most of the claims are based on Iquantics and Socorro's allegedly fraudulent promises of information technology ("IT") equipment that was paid for by Lefic or Dyntra but never delivered or not delivered in full, Am. Compl. ¶¶ 19-22.  Other claims are based on Socorro's allegedly false representations leading Dyntra in July 2018 and then Romero and Zavala in April 2019 to make loans of, respectively, $150,000 to Iquantics (the "Dyntra Loan"), $200,000 to Iquantics and Socorro (the "Romero Loan"), and $25,839.79 to Iquantics and Socorro (the "Zavala Loan"), id. ¶¶ 23-26.  The Plaintiffs allege that Socorro and Iquantics' fraudulent IT equipment sales scheme amounted to a racketeering operation encompassing Socorro, Iquantics, and others as-yet unidentified, with both named parties operating as a person distinct from the overall RICO enterprise within the meaning of the statute, 18 U.S.C. § 1961(4).  Am. Compl. ¶¶ 35-39.

Socorro and Iquantics moved to dismiss all counts on August 26, 2024.  Defs.' Mot. Dismiss Am. Compl., ECF No. 64.  This Court held a hearing on the motion on May 29, 2025, at the end of which it denied the motion as to all counts -- the counts for

[2]

fraud, conversion, breach of contract, breach of written and oral loan agreements and related claims -- except as to count I (the RICO claim), which it took under advisement and intended to write an opinion as to that count. Minute Entry, ECF No. 104; May 29, 2025 Hr'g Tr. 10:12-11:4, ECF No. 105.

Before the Court ruled as to Count I, however, the Defendants moved for summary judgment, which is fully briefed. Defs.' Mot. Summ. J. & Inc. Mem. Law ("Defs.' Mem."), ECF No. 119. The motion has been fully briefed. Pls.' Resp. Opp'n Defs.' Mot. Summ. J. ("Pls.' Opp'n"), ECF No. 125; Pls.' Counterstatement Material Facts Opp'n Defs.' Mot. Summ. J. ("Pls.' CSOF"), ECF No. 126.

The motion for summary judgment was heard on April 22, 2026, at which time the Court allowed the motion for summary judgment as to count I, the RICO claim, took the motion under advisement as to counts V, XII, XX and XXVI for conversion, and denied the motion as to all the other counts. Minute Entry, ECF No. 132; April 22, 2026 Hr'g Tr. 12:8-16, ECF No. 134.[2] Additionally, the Plaintiffs agreed that the amended complaint

_____

[2] During that hearing, the parties agreed to the Court's proposition to fold the remaining issues in the motion to dismiss into the motion for summary judgment -- given that the arguments are the same under both motions. April 22, 2026 Hr'g Tr. 4:10-25. The Court thus DENIES as moot the remainder of the motion to dismiss, ECF No. 64, that had been taken under advisement.

be treated as a verified complaint, based upon certain affidavits adopting the amended complaint's allegations as true and accurate.  April 22, 2026 Hr'g Tr. 5:17-24.

## II.  FACTS

The following facts are taken at times verbatim from the Amended Complaint, upon which the plaintiffs relied on at summary judgment.  Since these facts are primarily disputed only as to the intent of the parties, the Court recites them for background.  See Allen v. Board of Pub. Educ. for Bibb Cnty., 495 F.3d 1306, 1314 (11th Cir. 2007).  Quotations are omitted for readability.  Undisputed facts are denoted as such, referencing the statement of undisputed facts.

Lefic and Dyntra are foreign corporate entities organized under the laws of Mexico.  Am. Compl. ¶¶ 3-4; Pls.' CSOF ¶ 2. Romero and Zavala are residents and citizens of Mexico.  Am. Compl. ¶¶ 5-6.  Romero and Zavala "were not officers, directors, or shareholders of the corporate Plaintiffs."  Pls.' CSOF ¶ 16.

At all times material to this suit, Lefic was in the business of selling IT equipment and development services in Mexico, in the areas of security, biometrics, and IT administration, including identity smart cards with electronic wallets for use in mass transportation.  Am. Compl. ¶ 9.  Dyntra was also in the business of selling IT services.  Id. ¶ 10.

[4]

In or around 2013, Lefic sought a manufacturer to help create a software application to be provided to the Mexican government.  Id. ¶ 11.  Around this time, Socorro contacted Lefic and offered Iquantics' services, leading to a meeting in Mexico at which Socorro represented that Socorro and Iquantics had the skill and experience required for the job.  Id.  Lefic relied on this representation.  Id. ¶ 12.  Lefic also introduced its affiliated company Dyntra to Socorro, and Dyntra relied on the same representation regarding its own required services to the Mexican government.  Id. ¶ 13.

In late December 2017, the government of Mexico City awarded Lefic a contract for metro smart cards to access the city's metrobus system.  Id. ¶ 14.  Lefic ordered three million smart cards from Iquantics, paying $755,433.  Id.  Iquantics accepted the funds but delivered only 270,000 smart cards, and, as a result, Lefic claims that it lost its government contract and was penalized $148,462.26.  Id. ¶ 15.

After Lefic made repeated demands for the remaining cards, Socorro represented to Lefic, by phone calls and in person in Mexico, that the smart cards were manufactured by a French company, that this company was responsible for the delay, and that the cards had been detained by customs in Paris.  Id. ¶ 16. In early 2018, Socorro represented to Lefic, by phone calls, that he had filed a lawsuit against the French manufacturer and

[5]

would refund Lefic's funds after that lawsuit was resolved.  Id. ¶ 17.

Lefic and Dyntra continued to do business with Socorro and Iquantics because Iquantics had performed on other orders, they trusted Socorro, and the Mexican government had made several more orders and confirmed that it would make more.  Id. ¶ 18.

Lefic made further orders for, and paid for, IT equipment that Iquantics and Socorro failed to supply, including the smart card order, through the following payments: a $4,500 payment labeled "Credence Tab Mobil Smart Card Verify"; six payments ranging from $17,458 to $400,000, labeled "CALYPSO ST25TB512AC MEMORY"; a $62,500 payment labeled "POS Metro – N1-IQ0212"; $500,000 and $44,580.40 payments labeled "CHIP CON APP PORTACION DE ARMAS / CHIP 80K PARA LICENSIAS DE CONDUCIR / (J3H082C3A6) 80K Con App Porte De Armas Honduras"; and a $56,140 payment labeled "ACOPLE UNIVERSAL HOLOGRAMA CORTADO DE LAMINA Y DISEÑO PROPIETARIO / HOLOGRAMA SEGURIDAD NUEVO FORMATO Y DISEÑO (Rollo con 250 Escudos)."  Id. ¶ 19.  According to the plaintiffs, as to each of these equipment orders, Socorro and Iquantics represented to Lefic that Iquantics could and would supply the relevant equipment.  Id. ¶ 20.

Dyntra made orders for, and paid for, IT equipment that Iquantics and Socorro failed to supply, through the following payments: a $47,250 payment labeled "TRANSPORT VALIDATOR N2-

[6]

IQ0212," and a $11,760 payment labeled "KIOSK TRANSPORT CARD SAMPLE." Id. ¶ 21. For each equipment order covered by these payments, Socorro and Iquantics represented to Dyntra that Iquantics could and would supply the relevant equipment. Id. ¶ 22.

In or around July 2018, Socorro met with Lefic's principal in Mexico and requested a loan, whereupon Lefic referred Socorro to its related company Dyntra. Id. ¶ 23. Socorro represented to Dyntra that he had several pending international orders but was facing cash flow problems, including from the alleged French lawsuit. Id. ¶ 24. Based on these representations, Dyntra loaned Iquantics $150,000 on July 26, 2018, with an agreed-upon 14% rate of annual interest. Id. When the loan became due, Dyntra demanded payment, and Iquantics failed to tender it. Id.

Socorro subsequently asked Lefic's principal for another loan, whereupon Lefic put Socorro in touch with Romero and Zavala. Id. ¶ 25. Socorro represented to them that he had several pending international orders but was facing cash flow problems, including from the alleged French lawsuit. Id. Based on these representations, Romero loaned Socorro and Iquantics $200,000 on April 30, 2019, and Zavala loaned Socorro and Iquantics $25,839.79. Id. When the loans became due, Zavala and Romero demanded payment, and Socorro and Iquantics failed to tender it. Id. ¶ 26.

[7]

In or around May 2022, Socorro offered to supply equipment different from that which Lefic had ordered in order to satisfy outstanding orders, making it clear to Lefic and Dyntra that Socorro and Iquantics could not supply the ordered and paid-for equipment. Id. ¶ 27.

All wire transfers from the plaintiffs at issue originated in Mexico. No transfer originated from a United States Bank account, and all relevant wires terminated in the Defendants' accounts. Defs.' Mem. 2 et. seq., Statement Undisputed Material Facts ("SUF") ¶ 7. Deliveries of goods were made in Mexico and accepted under Mexican customs and regulations. Id. ¶ 10. Transactions were documented by order, invoice, and payment. Id. ¶ 13.

## III. ANALYSIS

The Court writes only with respect to the claims on which it allows the summary judgment motion: (1) the RICO claim (count I) because the Plaintiffs have not established the required domestic injury as matter of law; and (2) the conversion claims (counts V, XII, XX and XXVI) because they are merely recast breach of contract claims.

### A. Pleading Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue

[8]

of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Materiality depends on the substantive law, and only factual disputes that might affect the outcome of the suit can preclude summary judgment.  Id.

In reviewing the evidence, this Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  This Court must also "disregard all evidence favorable to the moving party that the jury is not required to believe." Id. at 151.  The moving party bears the initial burden of demonstrating that "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986).  If the movant does so, then the nonmovant must set forth specific facts sufficient to establish a genuine issue for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  "If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor."  Allen v. Board of Pub. Educ. for Bibb Cnty.,

[9]

495 F.3d 1306, 1314 (11th Cir. 2007) (citing Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003)).

## B. The RICO Claim (Count I) Fails for Lack of Domestic Injury

RICO's private right of action requires a domestic injury, which is absent here and why the Court allows the motion for summary judgment as to count I. As the Supreme Court has repeatedly admonished, "United States law governs domestically but does not rule the world." Abitron Austria GmbH v. Hetronic Intl., Inc., 600 U.S. 412, 428 (2023) (quoting Microsoft Corp. v. AT&T Corp., 550 U.S. 437, 452 (2007)). "Courts presume that federal statutes 'apply only within the territorial jurisdiction of the United States.'" WesternGeco LLC v. ION Geophysical Corp., 138 S. Ct. 2129, 2136 (2018) (quoting Foley Bros. v. Filardo, 336 U.S. 281, 285 (1949)). The presumption against extraterritoriality is a canon of statutory construction "provid[ing] that '[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application.'" Yegiazaryan v. Smagin, 143 S. Ct. 1900, 1908 (2023) (quoting RJR Nabisco, Inc. v. European Cmty., 579 U.S. 325, 335 (2016)). The Supreme Court has applied this presumption to private rights of action under RICO, "requir[ing] a civil RICO plaintiff to allege and prove a domestic injury to business or property" and emphasizing that RICO's private right

[10]

of action "does not allow recovery for foreign injuries." <u>RJR Nabisco</u>, 579 U.S. at 354.[3]  The Supreme Court initially did not expand upon what was sufficient to meet this standard, either in allegation or proof, because the parties in that case stipulated they were not seeking recompense for a domestic injury.  <u>Id.</u> The Supreme Court acknowledged, however, that "the application of this rule in any given [RICO] case will not always be self-evident, as disputes may arise as to whether a particular alleged injury is 'foreign' or 'domestic.'"  <u>Id.</u>

In June 2023, the Supreme Court expanded on how the district courts are to determine whether domestic injury is pleaded or proved as to intangible personal property.  To be sure, the "domestic-injury requirement 'does not mean that foreign plaintiffs may not sue under RICO.'"  <u>Yegiazaryan</u>, 143 S. Ct. at 1909) (quoting <u>RJR Nabisco</u>, 579 U.S. at 353, n. 12).[4]

---

[3] "Unlike RICO's private right of action, the substantive provisions of RICO **do** apply 'extraterritorially to [foreign conduct] the same extent that RICO's predicates do.'" <u>Ghebreyesus</u> v. <u>Federal Democratic Republic of Ethiopia</u>, No. 2:22-CV-01717-RFB-EJY, 2023 WL 6392611, at *7 (D. Nev. Sept. 30, 2023) (quoting <u>Yegiazaryan</u>, 143 S. Ct. at 1908) (emphasis added); <u>see</u> Randy D. Gordon, <u>RICO's Long Arm</u>, 20 S.C. J. INT'L L. & BUS. 36, 40 (2023) ("As the matter now stands, absent a **domestic** injury, a prosecutable criminal RICO violation will fail as a civil claim.").

[4] The presumption against extraterritoriality is supported by dual rationales: (1) international comity and the avoidance of international conflicts of law; and, (2) "'the commonsense notion that Congress generally legislates with domestic concerns in mind.'" <u>Smith</u> v. <u>United States</u>, 507 U.S. 197, 204 n.5 (1993).  Indeed, "RICO provides for drastic remedies . . . and a

[11]

Instead of a bright line test, however, what constitutes a domestic injury is a "context-specific inquiry," and "courts should look to the circumstances surrounding the alleged injury to assess whether it arose in the United States . . . [, i.e., e.g.,] to the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity." Yegiazaryan, 143 S. Ct. at 1909 (footnote omitted).  Nevertheless, "[b]ecause of the contextual nature of the inquiry, no set of factors can capture the relevant considerations for all cases" and therefore, "what is relevant in one case to assessing where the injury arose may not be pertinent in another."  Id. at 1910.

In sum, this Court must conduct "a contextual, fact-intensive inquiry that accounts for 'the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity.'"  Medical Marijuana, Inc. v. Horn, 145 S. Ct. 931, 941 (2025) (quoting Yegiazaryan, 143 S. Ct. at 1909).  "If the circumstances 'ground the injury in the United States,' and 'it is clear the injury arose domestically, then the plaintiff has alleged a domestic

---

person found in a private civil action to have violated RICO is liable for treble damages, costs, and attorney's fees."  H.J. Inc. v. N.W. Bell Tel. Co., 492 U.S. 229, 233 (1989) (citing 18 U.S.C. § 1964(c)).

[12]

injury.'" <u>Yerkyn</u> v. <u>Yakovlevich</u>, 164 F.4th 224, 230 (2d Cir. 2026) (quoting <u>Yegiazaryan</u>, 143 S. Ct. at 1910).

What does this mean?

To be sure, "<u>Yegiazaryan</u> did not establish the 'domestic injury' requirement for RICO civil actions; it only established the analysis courts must apply when deciding whether the requirement has been satisfied." <u>United States ex rel. Hawkins</u> v. <u>ManTech Intl. Corp.</u>, 752 F. Supp. 3d 118, 125 n.5 (D.D.C. 2024). This amorphous approach was criticized by Justice Alito in <u>Yegiazaryan</u> where he observed in his dissent that the Supreme Court's analytical framework provides "virtually no guidance to lower courts" and concluded that "[t]he only rule of law that the Court announces is that there is no rule, and despite offering such minimal guidance regarding how to site a RICO injury, the [Supreme] Court nonetheless manages to sow confusion." <u>Yegiazaryan</u>, 143 S. Ct. at 1912, 1915 (Alito, J., dissenting).

The Eleventh Circuit has not yet weighed in on how courts within this Circuit ought approach the <u>Yegiazaryan</u> analysis, and no Middle District of Florida cases have addressed it either. One court within this Circuit has acknowledged the difficulty in its application, noting that "<u>Yegiazaryan</u> and its progeny have not indicated whether the location of the alleged racketeering conduct or the location of the effects of that conduct weighs

[13]

more heavily." Aquino v. Mobis Alabama, LLC, 739 F. Supp. 3d 1152, 1185 (N.D. Ga. 2024). That court ruled that as between location of racketeering activity and the injury, "one does not necessarily matter more than the other." Id. at 1186 (citation omitted). As one student commentator rightly observed, while the Supreme Court's "endorsement of a contextual approach is clear" the "lack of elaboration calls into question Yegiazaryan's application to future cases that don't involve an identical set of facts." Alex Reid, Note, Born in the U.S.A.: Analyzing the Domesticity of Judgments in the Civil Rico Context, 92 U. CIN. L. REV. 874, 896 (2024) (footnote omitted); see also Gordon, supra note 3, at 49 (discussing the facts-and-circumstances approach and Justice Alito's concerns raised in dissent).

This Court agrees with Justice Alito that "[b]ringing clarity to this area of the law is not an easy task." Yegiazaryan, 143 S. Ct. at 1915. Certainly, the Yegiazaryan holding superficially has a Calvinball[5] analytical feel: a

---

[5] "Calvinball has only one rule: There are no fixed rules." National Insts. Health v. American Pub. Health Ass'n, 145 S. Ct. 2658, 2675 (2025) (Jackson, J., concurring in part and dissenting in part) (citing OXFORD ENGLISH DICTIONARY (2025), https://www.oed.com/dictionary/calvinball_n). "In the newspaper comic strip Calvin and Hobbes (1985-95) by U.S. cartoonist Bill Watterson, Calvinball refers to a game played by the characters in which the rules are made up by the players and changed in an ad hoc manner during play[.]" OXFORD ENGLISH DICTIONARY (2026), https://www.oed.com/dictionary/calvinball_n?tab=etymology

[14]

Gestalt-like framework that as Justice Alito points out provides little direct guidance for the trial courts to follow.

As the majority explained in <u>Yegiazaryan</u>, however, "[a]n approach is not unworkable, . . . merely because it directs courts to consider the case-specific circumstances surrounding an injury when assessing where it arises . . . . Concerns about a fact-intensive test cannot displace congressional policy choices, where a more nuanced test is true to the statute's meaning." <u>Yegiazaryan</u>, 143 S. Ct. at 1912.  In this Court's view, the Supreme Court has entrusted the trial courts with the task to work it out in the first instance, and if appealed, for the higher courts to review and further develop the law in this area.

This Court is, of course, duty-bound[6] to follow the Supreme Court's precedent, and does not shy away from undertaking a nuanced "contextual approach, surveying the 'injurious effects' of the defendant's conduct and pinpointing where they 'largely manifested,'" <u>Medical Marijuana, Inc.</u>, 145 S. Ct. at 941 (quoting <u>Yegiazaryan</u>, 143 S. Ct. at 1910), as mandated.  The

---

[https://doi.org/10.1093/OED/1086913330] (last visited June 15, 2026).

[6] As this Court is well aware, while "[l]ower court judges may sometimes disagree with [the Supreme] Court's decisions, . . . they are never free to defy them." <u>National Insts.  Health</u>, 145 S. Ct. 2658, 2663 (2025) (Gorsuch J., concurring in part and dissenting in part).

Court concludes that the Defendants are entitled to judgment as matter of law on the RICO claim because there is no domestic injury.

Turning to the merits, the Defendants point to the fact that the only purported injuries were economic losses incurred in Mexico, where funds originated in wire transfers to the United States, and none of the Plaintiffs' property located in the United States was injured.  Defs.' Mem. 5.

Plaintiffs counter, arguing the following provides domestic injury:

(1)    the Defendants, while operating from the United States, fraudulently induced the Plaintiffs to wire funds from Mexico banks to United States banks;

(2)    the Defendants fraudulently promised goods for these payments to be supplied from the United States;

(3)    the Plaintiffs had United States contacts, including: the goods that passed through United States Customs, one plaintiff had business meetings with the Defendants in the United States, and a purportedly related corporation was opened in Florida in 2016, which had a United States bank account, but did not have any transactions.

Pls.' Opp'n at 5.

[16]

Taking all inferences in favor of the Plaintiffs for purposes of summary judgment, the Court rules that virtually **all** of the racketeering activity occurred in the United States. The injuries, however, **all** manifested in Mexico.

The Plaintiffs primarily rely on the fact that money was wired from Mexico into the United States at the direction of the Defendants. Pls.' Opp'n 3-4. This direction from the Defendants is conduct, not injury. Since Yegiazaryan, courts have held that use of the American financial system **alone** is insufficient, because "[t]o conclude otherwise would effectively eliminate the effect of the domestic injury requirement in a large number of cases . . . ." See, e.g., Yerkyn, 164 F.4th at 230 (citation and quotations omitted). This Court agrees. It is a consideration, but not dispositive.

The Defendants' next argument is that the goods that were promised were to be supplied from the United States, and certain goods actually transited through United States Customs; these facts, while considered, are given little weight and are largely irrelevant. See Dixit v. Smith, No. 2:21-CV-02602-JTF-ATC, 2023 WL 6150816, at *5 (W.D. Tenn. Aug. 11, 2023) ("Whether the property 'originated on US soil,' . . . is irrelevant to determining whether an injury is a domestic one . . ."), report and recommendation adopted, No. 221CV02602JTFATC, 2023 WL 6367666 (W.D. Tenn. Sept. 29, 2023). Furthermore, it is

[17]

undisputed that the goods ultimately were, or intended to be, delivered in Mexico.  This is not a situation where goods were delivered **in the United States** to the Plaintiffs on their way to Mexico.  Cf. Global Master Int'l Grp., Inc. v. Esmond Nat., Inc., 76 F. 4th 1266, 1275 (9th Cir. 2023) (ruling that plaintiff Chinese companies suffered a domestic injury where, unlike the record here, the defendant delivered nonconforming orders to Los Angeles to fulfill purchase orders labeled "F.O.B., Los Angeles," resulting in injury to the foreign plaintiffs' property **within** the United States); see also Ferguson v. Republic of Trinidad and Tobago, 422 So. 3d 717, 726 (Fla. 3d DCA 2025) (Logue, J., concurring) (applying Yegiazaryan rubric to state law RICO act and finding domestic injury where the foreign plaintiff's letter of credit -- property -- was located in Miami), cert. denied sub nom. Ferguson v. Trinidad and Tobago, No. 25-1063, 2026 WL 1127238 (U.S. Apr. 27, 2026).

Finally, the Plaintiffs' descriptions of contacts with the United States in the form of some meetings in the United States, and that it had established a non-party, but related, business that had a United States bank account (though not used), even if relevant, describes conduct that is too tangential to the purported injuries here.  Pls.' Opp'n 5.

The Plaintiffs' reliance on the unreported decision of Akishev v. Kapustin, No. CV 13-7152(NLH)(AMD), 2016 WL 7165714

[18]

(D.N.J. Dec. 8, 2016), from the district of New Jersey is misplaced.  In that case, the court ruled that Russian plaintiffs had suffered domestic injury when the defendants, who operated car dealerships in the United States, fraudulently caused them to buy defective cars on the internet.  Id. at *7. The court reasoned that

> [p]laintiffs' traveling by way of the internet to [the defendant's] virtual United States-based car dealerships, where plaintiffs selected their car, paid for it by wire transfer to [the defendant's] U.S. bank, and arranged for shipping from the United States, should not change their injuries from domestic to foreign where [the defendant] failed to deliver their cars from the United States or refund their money from the United States.

Id.

According to that court, "[t]he key to this case is that plaintiffs suffered their injuries the moment they clicked the computer mouse – on a United States-based website representing United States-based car dealerships – and ordered and paid for a car whose condition was materially misrepresented or did not even exist at all."  Id.  That court attempted to reconcile and apply RJR Nabisco, centering on the location of the fraudulent conduct as controlling:

> In a fraudulent and criminal scheme that crosses borders, the extraterritoriality analysis should be a two-way street.  The Plaintiffs here could have been anywhere in the world and actually came from several countries.  Defendants, however, choose to operate their fraudulent scheme from New Jersey and Pennsylvania.  The locus delecti [(sic)] of the crimes committed is the

[19]

United States.  Nothing in 18 U.S.C. § 1964(c) suggests Congress intended to exclude a scenario like this one from the reach of a private victim, even a foreign one.

Id. at *8.

Relying on policy and purposive arguments, the court observed that "[a] person responsible for a United States-based fraudulent scheme to defraud people overseas should not escape liability under a federal law that permits private causes of action to redress that fraud simply because the scheme targets foreign citizens over the internet."  Id.

Akishev is, of course, a pre-Yegiazaryan case that is of questionable persuasiveness because it was not operating at all under the Supreme Court's current guidance as to determination of domestic injury, relying instead on the then-recently decided RJR Nabisco decision.[7]  Indeed, while the Court does not fault that court's reasoning in that moment, this Court could locate no case citing to Akishev post-dating 2020.  Akishev's holding is, arguably, "based on the unique features of the internet" and the traveling-like online shopping involved in that case, which is not precisely the issue here.  Worldspan Marine, Inc. v. Comerica Bank, No. 18-21924, 2020 WL 1238732, at *8 (S.D. Fla. Feb. 27, 2020).  Therefore, the Court views it as inapposite.

---

[7]  In rejecting this analysis, the Court means no disrespect.  In some ways, this Court is in the same position as the Akishev court: attempting to determine domestic injury with little guidance to rely upon.

[20]

Recognizing that the purported racketeering acts all occurred within the United States, in the context of all of the circumstances, the fact that no injury was ever incurred within the United States ultimately dooms this claim here.[8]  "The Supreme Court has . . . made clear that [the domestic injury] requirement cannot be satisfied through extraterritorial harm; a plaintiff 'must allege and prove a domestic injury to its business or property.'"  Hafez v. Vidino, No. CV 24-00873 (AHA), 2025 WL 2800719, at *5 (D.D.C. Sept. 30, 2025) (quoting RJR Nabisco, 579 U.S. at 346).  While "the place of racketeering conduct may be relevant to whether an injury is domestic or foreign.  . . . at the same time, it cannot be the case that a RICO injury necessarily arises wherever RICO conduct occurs."  Percival Partners Ltd. v. Nduom, 99 F.4th 696, 702 (4th Cir. 2024).  As the Fourth Circuit explained:

> To determine whether racketeering conduct is subject to RICO's criminal prohibitions, RJR Nabisco asks where the conduct occurred: If it occurred in the United States, RICO applies; if it occurred overseas, RICO may or may not apply, depending on the extraterritoriality of the relevant predicates.  **But either way, that racketeering activity gives rise to a private cause of action under RJR Nabisco only if it**

---

[8] It is not lost on this Court that its ruling as to domestic injury is cabined to the record before it, and as in Yegiazaryan, how this Court approaches all the circumstances in context in this case may -- or may not -- be instructive in other cases.  While perhaps unsatisfactory to development of the law, the Supreme Court's insistence on a nuanced test is a harbinger of this result.

> **also inflicted a domestic injury, a distinct and independent inquiry.**

Id. The focus is on the domesticity of the inflicted **injury,** not the racketeering **conduct,** and therefore though the racketeering conduct (and its location) may be relevant, its weight is properly neither fixed nor determinative. See Aquino, 739 F. Supp. 3d at 1186 (concluding that while "both factors are relevant . . . one does not necessarily matter more than the other." (quoting Percival Partners Ltd., 99 F.4th at 701)); see also pre-Yegiazaryan Glock v. Glock, 247 F. Supp. 3d 1307, 1318 (N.D. Ga. 2017) ("To be sure, the majority of the RICO conduct alleged by the Plaintiff took place in the United States, but that does not mean she suffered a domestic injury."), aff'd, 714 F. App'x 987 (11th Cir. 2018).

Given the newly announced "nuanced test," the dearth of post-Yegiazaryan persuasive authority, the absence of binding Circuit authority, and after undertaking the contextual analysis required under Yegiazaryan, the Court rules that there is an absence of a domestic injury as matter of law.

On this record and in the context of all of the circumstances, recognizing there is no one-size-fits all approach, the Court rules that the injuries certainly have connections to racketeering activity; the injuries are nonetheless wholly extraterritorial -- all occurring in Mexico.

[22]

Therefore, RICO's civil action is unavailable to the Plaintiffs. This Court therefore **ALLOWS** the motion for summary judgment as to the Plaintiffs' civil RICO claim.

### C. The Claims for Conversion Are Not Adequately Supported

The Defendants argue that the Plaintiffs' conversion claims fail because "they target **undifferentiated** [contractual] debts" and conversion does not "lie[] where the alleged wrongful conduct involves money that is due under a contract or represented by invoices, **unless** the plaintiff can identify a specific, segregated fund of money wrongfully taken or retained[,]" which they argue the Plaintiffs have not done. Defs.' Mem. 10 (second emphasis added).

Under Florida law, "[t]o establish a valid tort claim, a plaintiff must allege all the required elements for the cause of action . . . ." SN1017, Ltd. v. Logos Aviation, Inc., No. 23-CV-60201, 2024 WL 4453157, at *3 (S.D. Fla. Aug. 6, 2024). As stated by the Eleventh Circuit, "[i]n Florida, the tort of [c]onversion is an unauthorized act which deprives another of his property permanently or for an indefinite time." Marine Transp. Servs. Sea-Barge Grp., Inc. v. Python High Performance Marine Corp., 16 F.3d 1133, 1140 (11th Cir. 1994) (quoting National Union Fire Ins. Co. v. Carib Aviation, Inc., 759 F.2d 873, 878 (11th Cir. 1985)); see also Fogade v. ENB Revocable Tr., 263 F.3d 1274, 1291 (11th Cir. 2001) (same) (quoting

[23]

Senfeld v. Bank of Nova Scotia Tr. Co. (Cayman) Ltd., 450 So. 2d 1157, 1160-61 (Fla. 3d DCA 1984)); Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A., 781 F.3d 1245, 1258 (11th Cir. 2015) ("Under Florida law, '[a] conversion consists of an act in derogation of the plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time, is a conversion.'" (quoting Star Fruit Co. v. Eagle Lake Growers, Inc., 160 Fla. 130, 132, 33 So.2d 858, 860 (1948))); United Techs. Corp. v. Mazer, 556 F.3d 1260, 1270 (11th Cir. 2009) ("Conversion is an 'act of dominion wrongfully asserted over another's property inconsistent with his ownership therein.'" (quoting Thomas v. Hertz Corp., 890 So.2d 448, 449 (Fla. 3d DCA 2004))).

Importantly, however, "[t]o establish a valid tort claim [under Florida law], . . . the tort alleged must be **independent of any breach of contract claim**." SN1017, Ltd., 2024 WL 4453157, at *3 (emphasis added); see also Acadian Med. Consultants, LLC v. Innovative Glob., LLC, No. 1:22-CV-22155-KMM, 2023 WL 3191089, at *4 (S.D. Fla. Mar. 30, 2023) ("[A] Plaintiff's claim for conversion must be independent, separate and distinct from its breach of contract claims." (quoting Matonis v. Care Holdings Grp., LLC, No. 1:19-CV-20247-UU, 2019 WL 3386378, at *3 (S.D. Fla. June 25, 2019))); Christie v. Royal

[24]

Caribbean Cruises, Ltd., 497 F. Supp. 3d 1227, 1232 (S.D. Fla. 2020) (same); Rosen v. Marlin, 486 So. 2d 623, 626 (Fla. 3d DCA 1986) ("Where the compensatory damages requested in a count for tort are identical to the compensatory damages sought in a count for breach of contract, compensatory damages and punitive damages for the tort are not recoverable." (citing Rolls v. Bliss & Nyitray, Inc., 408 So.2d 229 (Fla. 3d DCA 1981), cert. dismissed, 415 So.2d 1359 (Fla. 1982))).

This is known as the independent tort doctrine, which "'bars a contracting party from recovery in tort where the act complained of related to the performance of the contract.'" Acadian Med. Consultants, LLC, 2023 WL 3191089, at *4 (citing Matonis, 2019 WL 3386378, at *3); see also Magma Glob., LLC v. NHT SP, LLC, No. 8:23-CV-2076-SDM-AEP, 2024 WL 2815640, at *3 (M.D. Fla. June 3, 2024) (Merryday, J.) ("A conversion claim cannot 'simply mirror[ ]' a breach of contract claim; rather, a conversion claim must 'go beyond' and 'be inde-pendent of' [a] breach of contract claim[ ]." (quoting Toms v. State Farm Life Ins. Co., 2022 WL 2758212, *3 (M.D. Fla. 2022) (Mizelle, J.) (internal citation omitted))). This, however, "is not to say that there can never be a claim for . . . conversion if there is a contractual relationship between the parties, but rather that the . . . conversion must go beyond, and be independent from, a

[25]

failure to comply with the terms of a contract." Gasparini v. Pordomingo, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008).

The Defendants argue that the Plaintiffs' allegations are the "classic hallmark of a contractual debt." Defs.' Mem. 11. As support, they argue that their relationship with the Plaintiffs was "governed by ordinary commercial documentation: orders, invoices, payments, and deliveries" with "every alleged transfer of funds correspond[ing] to an invoice tied to a project . . . ." Id. Tellingly, in each count of conversion, the Plaintiffs simply restate the same claims in the counts for breach of contract.

In Acadian, the plaintiff's breach of contract claim was based on the plaintiff paying for a product (masks) which the defendant failed to deliver -- the conversion claim was premised on the same. 2023 WL 3191089, at *5. "The acts that [the] [p]laintiff allege[d] constitute[d] conversion [were] exactly those that constitute[d] the breach." Id. The court also held that the damages in the conversion claim were "nearly identical and stem[med] directly from the alleged breach[,]" and dismissed the conversion claim as a result. Id.; see also Worldwide Distributors, Inc. v. Maven Med, Inc., No. 22-23635-CIV, 2023 WL 4303847, at *20 (S.D. Fla. June 15, 2023), report and recommendation adopted, No. 22-23635-CIV, 2023 WL 4295421 (S.D. Fla. June 30, 2023) (holding that the plaintiff's conversion

[26]

claim failed because its basis was the same as the breach of contract claim, where the defendant failed to deliver COVID test kits or return the money the plaintiff paid for it.).

The breach of contract and conversion claims in the instant case are similarly indistinguishable.  The allegation of conversion does not go beyond, and is not independent from, the claim that the Defendants failed to comply with the terms of each contract.  The separate loan agreements between the Defendants and Dyntra, Zavala, and Romero, and the various and separate contracts for IT equipment (including the smart card contract) between Lefic, Dyntra, and the Defendants, are mirror images of each other.  Compare Am. Compl. ¶¶ 76-79 (count V – Conversion: Lefic v. Socorro and Iquantics), with ¶¶ 89-93 (count VIII – Breach of Contract: Lefic v. Iquantics); compare ¶¶ 120-123 (count XII – Conversion: Dyntra v. Socorro and Iquantics) with ¶¶ 138-141 (count XVI – Breach of Loan Agreement and Promissory Note: Dyntra v. Iquantics) and ¶¶ 133-137 (count XV – Breach of Contract: Dyntra v. Iquantics); compare ¶¶ 161-164 (count XX – Conversion: Romero v. Socorro and Iquantics) with ¶¶ 142-145 (count XVII – Breach of Oral Loan Agreement: Romero v. Socorro and Iquantics); compare ¶¶ 194-197 (count XXVI – Conversion: Zavala v. Socorro and Iquantics) with ¶¶ 174-177 (count XXIII – Breach of Oral Loan Agreement: Zavala v. Socorro and Iquantics).

[27]

The Defendants further argue that the "Plaintiffs' inability to identify a specific, identifiable sum of money wrongfully taken and held is fatal."  Defs.' Mem. at 12.  As stated by the district court in Magma Glob., LLC,

> [i]f a plaintiff bases a conversion claim on the alleged deprivation of money only, the plaintiff must establish (1) that the money is "specific and identifiable," (2) that the plaintiff has an "immediate right to possess the money," (3) that [the defendant] committed an "unauthorized act [that] de-prive[d] [the] plaintiff of that money," and (4) that [the defendant] declined to return the money upon the plaintiff's request.

2024 WL 2815640, at *3 (quoting Freeman v. Sharpe Res. Corp., 2013 WL 2151723, at *2 (M.D. Fla. 2013) (Conway, J.)).  This is because "generic money . . . is not susceptible to 'conversion.'"  Id.; see also Allen v. Gordon, 429 So. 2d 369, 371 (Fla. 1st DCA 1983) ("[M]oney can be the subject of conversion if the specific money in question can be identified.") (citing Belford Trucking Company v. Zagar, 243 So. 2d 646, 648 (Fla. 4th DCA 1971)).

Citing to Joseph v. Chanin, 940 So. 2d 483, 486 (Fla. 4th DCA 2006), the Plaintiffs argue that they "do more than merely state an amount" and "state the date (or approximate date) of each transfer, state each amount, and describe each of the discrete transactions pursuant to which Defendants fraudulently enticed Plaintiffs into parting with each specific sum."  Pls.' Opp'n 17.  In Joseph, the court held that "[m]oney is capable of

[28]

identification where it is delivered at one time, by one act and in one mass . . ."  940 So. 2d at 486 (quoting <u>Belford Trucking</u>, 243 So. 2d at 648).

While it is true that the Plaintiffs allege the specific dates and amounts associated with each transfer in the amended complaint, <u>see</u> Am. Compl. ¶¶ 19, 21, 24-25, 43, these listed amounts are not independently identifiable outside of the various contracts between the Plaintiffs and the Defendants, meaning that the specificity requirement has not been met, and the independent tort doctrine still applies.  Further, a "mere obligation to pay money may not be enforced by a conversion action."  <u>Bostic</u> v. <u>Bodie</u>, No. 24-10126, 2025 WL 1443834, at *6 (11th Cir. May 20, 2025) (quoting <u>Belford Trucking</u>, 243 So. 2d at 648).  This is especially applicable to the loan amounts owed to Dyntra, Romero and Zavala.

Therefore, this Court ALLOWS the motion for summary judgment as to the conversion claims because the Plaintiffs have simply recast their breach of contract claims into claims for conversion.

## IV.  CONCLUSION

The Plaintiffs sued Socorro and Iquantics under the civil RICO statute, for fraud, conversion, and related violations of state law, and for breach of contract and breach of written and oral loan agreements.  Socorro and Iquantics moved for summary

[29]

judgment on all counts.  After hearing argument on the motion,
this Court **DENIED** the motion as to all counts except count I,
the alleged civil RICO violation, which it **ALLOWED**, and Counts
V, XII, XX and XXVI, the conversion claims, which it took under
advisement.  In addition to count I, the motion for summary
judgment, ECF No. 119, is also **ALLOWED** as to counts V, XII, XX
and XXVI, and is otherwise **DENIED**.

        **SO ORDERED.**

                                            WILLIAM G. YOUNG
                                            JUDGE
                                            of the
                                        UNITED STATES[9]

---

[9] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 48 years.

[30]